# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114

Incident #: 100300114

26-C °595

U.S. DISTRICT COURT
DISTRICT - WI
FILED

CLERK OF COURT

## Event

### 121 S 80TH ST MILWAUKEE, WISCONSIN

| | |
|---|---|
| Nature of Incident: | MISSREPORT |
| Elements of the Crime: | |
| Reported Date: | 08/08/2007 18:00:00 |
| Incident Start Date: | 08/03/2007 07:15:00 |
| Case Status: | CLOS (LEGACY DATA ONLY) |
| Date Indicator: | |
| Beat: | 320 |
| Longitude: | -88.01228 |
| Latitude: | 43.0308741 |
| Case Status Date: | 02/01/2010 |
| Previously Submitted By 3rd Party Software: | NO |
| Domestic Violence: | No |
| Evidence Collected: | NO |
| Processed Date/Time:: | |
| CAD Number:: | |
| PV-17 Issued:: | No |
| PDMP Form Completed: (If Applicable): | No |
| This Incident is a Non-Fatal Shooting:: | No |
| This Incident is a Robbery with a vehicle taken: (Car Jacking): | No |
| This is a Home Invasion type of Incident:: | No |
| Photos Taken:: | |
| Description of Photos Taken:: | |
| Processed For Prints:: | |
| Processing Used For No Lifts:: | |
| Processing Used For No Lifts:: | |
| Number of DNA samples:: | |
| Tow Lot Processing: | |
| Other Processing:: | |

## Misc. Associated Names Data (4)

### RICHARDSON, ANDREW   (RICHARDSON,ANDREW)

| | |
|---|---|
| DOB: | 08/08/2007 |
| Age: | 7 |
| Sex: | MALE |
| Race: | WHITE |
| Ethnicity: | NOT HISPANIC/LATINO |
| Address: | 121 S 80TH ST |
| Floor: | |
| City: | MILWAUKEE |

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 1 of 68    Document 1-1

EXHIBIT A

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

| | |
|---|---|
| State: | WISCONSIN |
| Zip Code: | 53214 |
| Person Number: | 1 |
| Phone 1 Type: | Home |
| Phone 1 Number: | 414-460-9136 |
| Height: | 100 |
| Weight: | 30 |
| Wears Glasses: | NO |
| Eye Color: | Blue |
| Hair Color: | Blond or Strawberry |
| Injury: | NO |
| Statement: | NO |
| Employer Name: | UNKNOWN |

## RICHARDSON, ANDREW   (RICHARDSON,ANDREW)

| | |
|---|---|
| DOB: | 04/09/2006 |
| Age: | 1 |
| Sex: | MALE |
| Race: | WHITE |
| Ethnicity: | NOT HISPANIC/LATINO |
| Address: | 121 S 80TH ST |
| Floor: | |
| City: | MILWAUKEE |
| State: | WISCONSIN |
| Zip Code: | 53214 |
| Person Number: | 2 |
| Phone 1 Type: | Home |
| Phone 1 Number: | 414-460-9136 |
| Height: | 100 |
| Weight: | 30 |
| Wears Glasses: | NO |
| Eye Color: | Blue |
| Hair Color: | Blond or Strawberry |
| Injury: | NO |
| Statement: | NO |

## FARAH-SALDIVAR, MARIANA   (FARAH-SALDIVAR,MARIA)

| | |
|---|---|
| DOB: | 05/25/1971 |
| Age: | 41 |
| Sex: | FEMALE |
| Race: | WHITE |
| Ethnicity: | UNKNOWN |
| Address: | SAN HILARIO 72 |
| Floor: | |
| City: | QUETERARO |
| Zip Code: | 76050 |
| Person Number: | 3 |
| ████████████████ | |
| Height: | 506 |

| | |
|---|---|
| Weight: | 120 |
| Wears Glasses: | NO |
| Eye Color: | Brown |
| Hair Color: | Brown |
| Injury: | NO |
| Statement: | NO |

## RICHARDSON, TREVOR

| | |
|---|---|
| DOB: | 05/25/1971 |
| Age: | 42 |
| Sex: | MALE |
| Race: | WHITE |
| Address: | 121 S 80TH ST |
| Floor: | |
| City: | MILWAUKEE |
| State: | WISCONSIN |
| Zip Code: | 53214 |
| Person Number: | 4 |
| Phone 3 Type: | Cell |
| Phone 3 Number: | 414-460-9136 |
| Height: | 0 |
| Weight: | 0 |
| Wears Glasses: | NO |
| Injury: | NO |
| Statement: | NO |

## Witness Of Incident Data (1)

## RICHARDSON, TREVOR

| | |
|---|---|
| DOB: | 05/25/1971 |
| Age: | 44 |
| Sex: | MALE |
| Race: | WHITE |
| Ethnicity: | NOT HISPANIC/LATINO |
| Address: | 8252 STATION VILLAGE LN UNIT 2309 |
| Floor: | |
| City: | SAN DIEGO |
| State: | CALIFORNIA |
| Zip Code: | 92108 |
| Person Number: | 1 |
| Phone 3 Type: | Cell |
| Phone 3 Number: | 414-460-9136 |
| Height: | 0 |
| Weight: | 0 |
| Wears Glasses: | NO |
| Injury: | NO |
| Statement: | NO |
| Email or Social Media:: | Trichardson7769@gmail.com |
| Employer Name: | UNKNOWN |

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 3 of 68     Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114                                                      Incident #: 100300114

| Person Reporting Event Data (1) |
|---|

## RICHARDSON, TREVOR

| | |
|---|---|
| DOB: | 05/25/1971 |
| Age: | 36 |
| Sex: | MALE |
| Race: | WHITE |
| Ethnicity: | NOT HISPANIC/LATINO |
| Address: | 121 S 80TH ST |
| Floor: | |
| City: | MILWAUKEE |
| State: | WISCONSIN |
| Zip Code: | 53214 |
| Person Number: | 1 |
| Phone 1 Type: | Home |
| Phone 1 Number: | 414-460-9136 |
| Height: | 0 |
| Weight: | 0 |
| Wears Glasses: | NO |
| Injury: | NO |
| Statement: | NO |

| Offenses (1) |
|---|

## MISSING JUVENILE (LEGACY)Missing Juvenile

| | |
|---|---|
| NIBRS Code:: | ALL OTHER OFFENSES |
| Reportable: | Yes |
| Modifiers/Enhancers: | |
| Bias Motivation: | NONE |
| Cargo Theft: | NO |
| Location Type: | |
| Weapon Types: | |
| Completed: | No |
| Forced Entry: | No |
| Offense Location: | |
| Counts: | 1 |

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 4 of 68     Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

## Vehicle (0)

**Related Offense:**

**VIN:**

**Recovered Date:**

**Number of Plates on Vehicle::**

**Was Vehicle Taken With Keys? If Yes, explain:**
**Was Vehicle Taken with Keys?:**

## Recovered Vehicle (0)

**Address::**

**Tow Number::**

**Was Victim Notified of Recovery? (If No, Explain):**
**Who made or attempted to make Notification? (Name & Peoplesoft):**
**Vehicle Cleared out of the NCIC/CIB Files By::**
**Plate Status::**

## Vehicle Recovery Info (0)

**Tow Number::**

**Vehicle Cleared out of the NCIC/CIB Files By::**

## Stolen Vehicle (0)

**VIN::**

**Vehicle Value::**

## Property (0)

**Related Offense:**

**Property Involvement::**

**Account Name::**

## Drug (0)

**Related Offense:**

**Drug Involvement::**

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

## Gun (0)

**Related Offense:**

**Gun Involvement::**

## Narrative (11)

### Elements of the Crime 0000

**ST CLAIR,CHET A 016638**        **08/08/2007**

On the above date and time, listed subject was reported missing.

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the home::** No

**Has Victim or Witness Observed Abuse to Pets::** No

**Previous Violence History::**

**Abused or Neglected Animals in the home::**

**Victim Demeanor::**

**Victim was Intoxicated or Influenced by Drugs::** No

**Victim was Intoxicated or Influenced by Drugs::**

**Suspect Demeanor::**

**Suspect was Intoxicated or Influenced by Drugs::** No

**Suspect Arrested::** No

**Suspect was Intoxicated or Influenced by Drugs::**

**Do Victim/Suspect have children in common?::**

**Wisconsin Department of Children and Families Notified (220-7233)::** No

**Evidence Collected::**

**Location Where Photos Were Taken::**

**1) Has he/she ever used a weapon against you or threatened you with a weapon?:**

### Tiburon Supplement 0000

**ST CLAIR,CHET A 016638**        **08/08/2007**

Listed subject is possibly with his mother, Mariana FARAH-SALDIVAR h/f 11-25-77. Subject last seen at daycare in Mequon by father on 08-03-07 at 07:15 AM. Subject is supposed to be placed with father as of 4:15 pm 08-08-07. See Sensitive Crimes supplement for additional information.

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 6 of 68     Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114                                    Incident #: 100300114

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed** No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**
**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children** No
**and Families  Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0001

**ST CLAIR,CHET A 016638**                                    **05/30/2011**

This supplement is written by PO Scott HORNE assigned to District Four Days.  On Monday 05-30-11 at 13:05, I
spoke with Trevor RICHARDSON who stated his son, Andrew RICHARDSON, is still missing and may be in Mexico.

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 7 of 68     Document 1-1

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed** No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or**          No
**Influenced by Drugs::**
**Suspect Arrested::**                   No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children**     No
**and Families  Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0002

**ORTIZ, ROBIN M 000591**                                      **10/07/2012**

This report is submitted by PO Robin Ortiz assigned to the Sensitive Crimes Division day shift.

On Tuesday  10/01/2012 squad 3780 I PO Robin Ortiz conducted a follow up investigation.

Sgt Charlene Kennedy about three weeks ago had received a phone call from a Edgar Lopez. Lopez was calling from the phone#442-311-9859. He was an employee with Bombardier Aerospace located in Mexico. He recently had seen a poster for a missing child identified as Andrew Richardson. The childs mother Mariana Farah-Saldivar is employed at Bombardier and he works with her. Lopez left the call back number of ph#011-52-442-101-7500.

On Tuesday 10/02/2012 I had received an e-mail from a Saul Leyva II . He is employed with US State Department Office of Children's Issues Washington DC office ph#202-736-9146 fax#202-736-9132 e-mail address LeyvaS@State.gov. This e-mail was addressing the issue which involved the US Embassy in Mexico City. US Embassy representative on the behalf of Trevor Richardson was attempting to schedule a supervised visit with his son  Andrew Richardson. The US Embassy representative was attempting to contact the childs mother Mariana Farah-Saldivar through a ph#442-234-1987. This phone number in currently out of service and were requesting if there was an alternative  phone number available.

On Thursday 10/04/2012 at 11:00 am  I call the phone #011-52-442-101-7500 ext#51371 and interviewed a

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 8 of 68     Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444




Edwardo Lopez who is employed with Bambardier. Lopez denied having any knowledge of an employee named Edgar Lopez. Lopez denied of having any knowledge of calling the Milwaukee Police Department. Lopez was advised if he would locate Edgar Lopez or Mariana Farah-Saldivar to have them call me at SCD.

On Thursday 10/04/2012 at 1:30 pm I received a phone call from Mariana Farah-Saldivar from her cell ph#011-521-1-442-194-9484. Farah-Saldivar stated that she was currently at work in a meeting and could not talk. Farah-Saldivar stated she would be willing to talk with me on Saturday 10/06/2012 at 9:00 am.

On Saturday 10/06/2012 at 10:00 am I did establish phone contact with Farah-Saldivar who stated at the advice of her lawyer she would not be able to make a statement. Farah- Saldivar stated in September 2012 a court hearing which is part of the Hague Convention had taken place in Mexico City. The court had ruled in her favor which denied Trevor Richardson's request for visitation to take place in the United States. Farah-Saldivar states she has a copy of that court order and would have the order translated to English. Then send me a copy of that order to the Sensitive Crimes Division.

On Saturday 10/06/2012 I received a an e-mail from The National Center for Missing and Exploited Children. The center reported on 10/05/2012 at 10:23 am their agency received a phone call from Edgar Lopez who is employed with Bombardi Aircraft Carrier Manufacturing Corporate Offices located at Carreteara Estaltal 200 Querataro Tequisquiapan No 22500 Bodegas 9 y 10 Galeras which is located in Queretaro Mexcio. Lopez was reporting he works closely with Mariana Farah-Saldivar who is the mother of the report missing child Andrew Richardson. Caller also report he has been harassed by local law enforcement and is in fear of loosing his employment.

For further details regarding this missing person investigation refer to inc#072210128 interference with child custody.

Further investigation is pending.

 
Case 2:26-cv-00595-SCD      Filed 04/08/26      Page 10 of 68      Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed** No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**
**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children** No
**and Families Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0003

**MEJIAS RIVERA,JONATHAN 015348**          **10/28/2013**

This supplemental report is written by P.O. Jonathan MEJIAS-RIVERA, assigned to Dist. 3, Early Power.

On Monday, 10-28-13, at approximately 1:15PM, I, P.O. MEJIAS-RIVERA, made contact with RICHARDSON Trevor via phone.

RICHARDSON advised me that his son is still missing. He stated that he is going through a custodial battle for over the past 6 years and knows that the mother took the child to Mexico. He stated he was working with Sensitive Crimes in an attempt to get his child back.

He related that US Government departments have attempted to make contact with the mother, but that she has been very uncooperative with them. He wants to know if the child is okay.

See IR 07-221-0128 for related offense.

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**

**Has Victim or Witness Observed** No
**Abuse to Pets::**

**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**

**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**

**Victim was Intoxicated or Influenced**
**by Drugs::**

**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**

**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**

**Do Victim/Suspect have children in**
**common?::**

**Wisconsin Department of Children** No
**and Families  Notified (220-7233)::**

**Evidence Collected::**

**Location Where Photos Were**
**Taken::**

**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0004

**BURGOYNE, CAROL M 001216**          **05/31/2014**

This report is being submitted by PO Carol BURGOYNE of District 3 - day shift.

On Saturday, 5-31-14 at approx 9:00AM sq 3140 (BURGOYNE) responded to the address of 121 S. 80th St to check on the status of this missing juvenile. I did not receive an answer at the door. I also called the listed phone number and received voice mail.

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114                                    Incident #: 100300114

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed**     No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or**          No
**Influenced by Drugs::**
**Suspect Arrested::**                   No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children**     No
**and Families  Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0005

**JACKSON, DONALD 005258**                                    **08/07/2014**

This report was written by P.O. Donald L. JACKSON assigned to District Three Day Shift.

On Wednesday, August 6, 2014, at 8:30am, I P.O. JACKSON tried calling Trevor RICHARDSON regarding the reported missing person Andrew RICHARSON at that time I got no answer. This case is pending.

Case 2:26-cv-00595-SCD     Filed 04/08/26     Page 13 of 68     Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed**     No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or**          No
**Influenced by Drugs::**
**Suspect Arrested::**                   No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children**     No
**and Families  Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0006

**HUGHES, MARY F 008706**                                              **08/15/2014**

This report is written by P.O. M HUGHES, assigned to D3 FRONT DESK DAYS.

On Fri 08-15-14, 10:55am, I, P.O. M HUGHES, attempted to reach Andrew RICHARDS at his aforelisted phone - 414-460-9136 - at which time I received no answer at same.

Case is pending at this time.

 
Case 2:26-cv-00595-SCD      Filed 04/08/26      Page 14 of 68      Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114                                                Incident #: 100300114

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**

**Has Victim or Witness Observed** No
**Abuse to Pets::**

**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**

**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**

**Victim was Intoxicated or Influenced**
**by Drugs::**

**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**

**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**

**Do Victim/Suspect have children in**
**common?::**

**Wisconsin Department of Children** No
**and Families Notified (220-7233)::**

**Evidence Collected::**

**Location Where Photos Were**
**Taken::**

**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0007

**RIVERA, ISRAEL 021529**                                       **09/20/2014**

This report was written by P.O. Israel RIVERA assigned to District Three Early Power Shift.

On Saturday, September 20th, 2014, at 2:12 p.m., I, P.O. RIVERA tried calling Trevor RICHARDSON regarding the reported missing person Andrew RICHARSON and received no answer at that time.

This case is pending.

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 15 of 68    Document 1-1

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**

**Has Victim or Witness Observed** No
**Abuse to Pets::**

**Previous Violence History::**

**Abused or Neglected Animals in the
home::**

**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**

**Victim was Intoxicated or Influenced
by Drugs::**

**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**

**Suspect Arrested::** No

**Suspect was Intoxicated or
Influenced by Drugs::**

**Do Victim/Suspect have children in
common?::**

**Wisconsin Department of Children** No
**and Families  Notified (220-7233)::**

**Evidence Collected::**

**Location Where Photos Were
Taken::**

**1) Has he/she ever used a weapon
against you or threatened you with
a weapon?:**

## Tiburon Supplement 0008

**KRAMSCHUSTER,JON E 024044**        **01/07/2015**

This report was typed by Police Aide Jon KRAMSCHUSTER, assigned to District 3, early shift.

    On Wednesday, January 7th, 2015 at 4:15 P.M., I contacted Trevor RICHARDSON regarding the reported missing person Andrew RICHARDSON.  Trevor stated Andrew is still missing and has not returned home.

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**
**Has Victim or Witness Observed** No
**Abuse to Pets::**
**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**
**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**
**Victim was Intoxicated or Influenced**
**by Drugs::**
**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**
**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**
**Do Victim/Suspect have children in**
**common?::**
**Wisconsin Department of Children** No
**and Families  Notified (220-7233)::**
**Evidence Collected::**

**Location Where Photos Were**
**Taken::**
**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

## Tiburon Supplement 0009

**SMITH, BENJAMIN J 008702**                                              **06/24/2015**

This report is written by P.O. Benjamin Smith of the Sensitive Crimes Division, Day Shift.


   The Hauge court ruled in favor of Mariana Farah-Saldivar (W/F 11/25/1977) who is the mother of  Andrew Richardson (W/M 04/09/2006).  The court ruled that Andrew Richardson may legally live in Mexico with his mother. Trevor Richardson who is the father of Andrew Richardson was notified, and has not filed an appeal to this court ruling.


   The following agency's assisted Mr. Richardson with this investigation:


* Hector Heredia

  Case Manager for National Center for Missing & Exploited Children

  (877-446-2632 ext. 3125

  HHeredia@NCMEC.ORG


* Adriana Schiffer

# Milwaukee Police Department

749 W. State Street Milwaukee, WI 53233

414-933-4444

Case #:100300114                                                      Incident #: 100300114

Office of Children's Issues (CA/OCS/CI)

2201 C Street NW, SA-17 9th Floor

Washington, DC 20522-1709

202-485-6220

SchifferA@state.gov

\* ADA Matthew Torbenson

Milwaukee County District Attorney's Office

949 N. 9th St. Room 102

414-278-5019

ADA Matthew Torbenson advised that Andrew Richardson should be taken out of NCIC as a missing person. This case is related to MPD case # 07-2210128 regarding interference with the custody of a child. Mariana Farah-Saldivar is listed as the suspect in this offense, and a warrant (J45120) has been issued for her arrest. ADA Matthew Torbenson advised that the warrant should remain active.

This report was cleared via MPD tele-type # MWYA037.

**DV Hotline Called At::**

**Existing Case On File::**

**Abused or Neglected Animals in the** No
**home::**

**Has Victim or Witness Observed** No
**Abuse to Pets::**

**Previous Violence History::**

**Abused or Neglected Animals in the**
**home::**

**Victim Demeanor::**

**Victim was Intoxicated or Influenced** No
**by Drugs::**

**Victim was Intoxicated or Influenced**
**by Drugs::**

**Suspect Demeanor::**

**Suspect was Intoxicated or** No
**Influenced by Drugs::**

**Suspect Arrested::** No

**Suspect was Intoxicated or**
**Influenced by Drugs::**

**Do Victim/Suspect have children in**
**common?::**

**Wisconsin Department of Children** No
**and Families Notified (220-7233)::**

**Evidence Collected::**

**Location Where Photos Were**
**Taken::**

**1) Has he/she ever used a weapon**
**against you or threatened you with**
**a weapon?:**

| Officer (1) |
|---|
| **Reporting Officer:** ST CLAIR,CHET A (016638) |

| PO/Detective Requesting Comparison (0) |
|---|
| **Officer:** |



MILWAUKEE COUNTY CIRCUIT COURT
BRANCH 37

MILWAUKEE COUNTY COURTHOUSE
901 NORTH 9TH STREET
MILWAUKEE, WISCONSIN 53233
(414) 278-4512

KAREN E. CHRISTENSON
JUDGE

KIM SNORTUM
CLERK

ROSE COULTHART
CHRISTINE CHARETTE
COURT REPORTERS

January 8, 2009

District Attorney John Chisholm
Safety Building, Room 412
821 W. State St.
Milwaukee, WI 53233

Re: Case 08JD22, Trevor Richardson/ Mariana Saldivar

Dear District Attorney Chisholm:

When former Chief Judge Kitty Brennan resigned, she assigned this case to me. I understand that your office, specifically Gary Mahkorn, has been reviewing possible charges for some time. As you are aware, Mr. Richardson initiated Hague Convention proceedings in Mexico to attempt to enforce my family court decision awarding him custody and placement of his minor son. I understand that the initial Hague decision, issued on September 12, 2008, awarded the child to Mr. Richardson; however, a Mexican appeals court decision on November 24, 2008, reversed the trial court.

Mr. Richardson has renewed his request that I issue a criminal complaint pursuant to §968.02(3) because you refuse or are unavailable to issue a complaint. I did speak directly to Gary Mahkorn about this a year or so ago, but I have heard nothing since concerning your office's investigation. My clerk has scheduled a hearing for Mr. Richardson on February 2, and he has submitted a subpoena to Officer Robin Ortiz, among others, for my signature. I am requesting a letter indicating your office's charging decision as soon as possible and the opportunity to review Mr. Mahkorn's file, if he declines prosecution.

Thank you very much.

Sincerely,

/s/

Karen E. Christenson
Circuit Court Judge, Branch 37

Cc: Gary Mahkorn; Trevor Richardson

EXHIBIT D



CLERK OF CIRCUIT COURT
CIVIL DIVISION

# Milwaukee County

ANNA M. HODGES
Administrator

PAULA L. BLACK
Assistant Administrator

**JOHN BARRETT** · Clerk of Circuit Court/Court Services Director

## STATE OF WISCONSIN COUNTY OF MILWAUKEE

## CERTIFICATION

**IN RE: The Marriage of Mariana Farah Saldivar vs. Trevor Richardson**
**Circuit Court Case Number 07FA001156**

**April 22, 2008**

**This is to certify that I, Paula L. Black of Clerk of Circuit Court, Civil Division, am the legal custodian of the records of this court and the keeper of its' seal.**

**Attached is a transcript from the January 2, 2008 hearing between the parties listed above. I certify that there is a total of forty (40) pages included in this transcript and the pages are a true and correct copy of the original.**

**In witness whereof, I hereunto set my hand and the seal of my office this 22nd of April, 2008.**

**SIGNED** _____
**PAULA L. BLACK**
**Assistant Administrator/**
**Civil Division**

**SIGNED** _____
**JOHN BARRETT**
**CLERK OF CIRCUIT COURT/**
**COURT SERVICES DIRECTOR**



COURTHOUSE, ROOM G9 · 901 NORTH 9TH STREET · MILWAUKEE, WISCONSIN 53233 · (414) 278-4120 · TDD # 223-1830

1673 R18

EXHIBIT C

STATE OF WISCONSIN : CIRCUIT COURT : MILWAUKEE COUNTY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re the Marriage of:

MARIANA FARAH SALDIVAR

V.                                    Case No. 07 FA 001156

TREVOR RICHARDSON

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HEARING

FEB 27 2008

ORIGINAL

TRANSCRIPT OF PROCEEDINGS

Before the **HONORABLE KAREN CHRISTENSON, BRANCH 37,**

Circuit Court Judge, presiding.

January 2, 2008

APPEARANCES:

    Attorney Keith R. Wessel, Madison, Wisconsin, representing the respondent.

    Attorney Perry Friesler, Milwaukee, Wisconsin, guardian ad litem for the minor child.

    The respondent in proper person.

PROCEEDINGS

THE COURT: Case 07 FA 1156, in re the marriage of Mariana Saldivar and Trevor Richardson. Appearances.

MR. WESSEL: The respondent, Trevor Richardson, in person with Keith Wessel.

MR. FRIESLER: Guardian ad litem Perry Friesler is also present.

THE COURT: Nice of you to come, Mr. Wessel. I gather we are here for your motion on 948.02(3).

MR. WESSEL: Actually, I think we are scheduled for a final divorce.

THE COURT: That is what you expect to do today?

MR. WESSEL: Yes.

THE COURT: Okay, good. I thought perhaps you were here thinking we were going to have a hearing on this request and I thought, okay. All right. I did refer that request to the chief judge because I wanted to know if we had any policies or anything along those lines and she's out of the country until a week from today. When I talked to her before she left, she said that she was told by the district attorney's office that they were still reviewing it. I don't know what information Mr. Richardson got that they had turned down

2

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 23 of 68    Document 1-1

the request.

MR. WESSEL: We received correspondence from her, as well, indicating that the district attorney is responding, that they are still investigating it. Mr. Richardson has been frustrated by their essential--in defense of their statement saying they are not doing anything. It is not a lot to investigate, there are potential new charges because this Court entered an injunction subject to a two year felony for violation; she's not been served with that order as of yet, but she's clearly in violation of that.

THE COURT: She did call the Court this morning. Did anybody tell you that?

MR. WESSEL: No.

THE COURT: She called the Court twice, unfortunately, we were on the record and the bailiff tried to transfer the call to the clerk and the connection was not good enough to understand what was being said. I don't know if that was the first time or the second time, but he said she called twice.

THE BAILIFF: She called to say she was supposed to have a case here at 1:30 this afternoon and wanted to see if she could make a telephone appearance. I said hold on and transferred it to the clerk. While she was waiting she got disconnected, she called again,

3

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 24 of 68    Document 1-1

I transferred her to the clerk again and it was a bad connection and she couldn't hear.

THE COURT: So we have been hoping that she would call again but apparently she hasn't.

Let me go through this, has he complied with the parental education requirement?

MR. RICHARDSON: No, I have not.

THE COURT: That is a requirement in Milwaukee County if not in other jurisdictions. It is a half day and they are offered in a number of different locations. If you want to take testimony today and then we can adjourn the final granting of the divorce until he has complied with that requirement we can do that.

MR. WESSEL: Okay.

THE COURT: Mr. Richardson, come up to the witness stand. Did you file a response?

MR. WESSEL: He did with prior counsel.

THE COURT: Do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please be seated and I am going to ask you to state and spell your name.

THE WITNESS: Trevor Andrew Richardson, R-I-C-H-A-R-D-S-O-N.

4

THE COURT: Thank you. Whenever you are ready.

DIRECT EXAMINATION BY MR. WESSEL:

Q Mr. Richardson, you are the respondent in this action?

A Yes.

Q You filed a counterclaim seeking an absolute divorce?

A Yes.

Q Are you asking the Court to order that you have sole custody of your minor child?

A Yes.

Q Are you asking the Court to--let me--

MR. WESSEL: For jurisdictional purposes, would it be appropriate for him to review the initial petition? I have a copy.

THE COURT: Okay.

BY MR. WESSEL:

Q You have now been handed a copy of the initial petition in this action, were you served with a copy of that petition?

A Yes.

Q When you were served with it, did you review its contents?

A Yes.

Q And was the content--were the allegations made in that petition true?

5

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 26 of 68    Document 1-1

A    The allegations, no.

Q    What if anything was not true in that petition?

A    11--item 11B, that the petitioner only resided in Mexico.

Q    Why is that not true?

A    Well, it doesn't state that in the original petition, it states that--you would assume that all of us reside there, me, Andrew, Mariana, where it is just Mariana and Andrew.

Q    At the time that document was filed with the Court, where were you living?

A    West Allis, Wisconsin.

Q    Had you lived in the state of Wisconsin for six months prior to that date?

A    Yes.

Q    Had you lived in Milwaukee County for 30 days prior to that date?

A    Yes.

Q    With regard to Mariana, your--the petitioner, had she lived in the state of Wisconsin for six months prior to the filing of that document?

A    Yes.

Q    Did she live in Milwaukee County for 30 days prior to filing?

A    Yes.

6

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 27 of 68    Document 1-1

Q Does that document set forth your address?

A Yes.

Q Was that address correct for you at the time of the filing of that document?

A Yes.

Q Does that document set forth your social security number?

A Yes.

Q Is that your correct social security number?

A Yes.

Q That document set forth the date of your marriage?

A Yes.

Q What was the date of your marriage?

A August 9, 2004.

Q Where were you married?

A Menomonee, Michigan.

Q You have prepared a financial disclosure statement?

A Yes.

Q Addressing that document, turning your attention to the last page, did you sign that document on today's date?

A Yes.

Q That is a document that you prepared on your own?

A Yes.

Q Does that document accurately set forth your income, your assets, and your liabilities as of today's date?

7

A Yes. Well, I take that back. The debts were the debts at the time Mariana had left the marriage.

Q Are there new debts that have been incurred since that date?

A The credit card debt is what I am mostly talking about as far as the debt that was given on the statement relevant to the time Mariana left the marriage. The new debts, as far as the debts for the attorneys I am requesting relief from for Jose, the attorney in Mexico; that is a debt also that I owe that I am requesting help from, so that is the only new debt on this--well, not new debts --

Q Are there debts that are not included in this financial disclosure statement that you are obligated to today?

A No.

Q All of your assets are listed on this financial disclosure statement?

A Yes.

Q You are the father of Andrew?

A Yes.

Q When was the last time you saw him?

A August 3, 2007.

Q Do you know where he is today?

A Yes, Pietro, Mexico.

Q Have you made any efforts to see him since August of

8

2007?

A  Yes.

Q  Can you describe those efforts?

A  I have made two requests to the embassy in Mexico to do a health and whereabouts check. The first check, they located him, said he was in good health and that he was with his mother at her mother's house in Mexico. The second whereabouts check I requested, they weren't able to locate him, they said he was at the beach. And the embassy is not required to go back to follow up that.

When I was there in November of 2007, November 12, I asked my attorney down there--when I was attending a hearing down there--if it was possible to be able to request the ability to go see Andrew. At that time, he told me it was not, right now Mariana, as of November 12, wasn't found -- since she's been located, I have not been able to fly down and see Andrew.

Q  You indicated that you have counsel in Mexico, did you retain this attorney to facilitate your being able to spend time with Andrew?

A  Yes.

Q  And has he filed documents on your behalf and appeared in court for you?

A  Yes, he has power of attorney for me down there.

Q  Have you retained him solely to enforce the order for

9

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 30 of 68    Document 1-1

placement and custody that you have in this case?

A  That and also to file a Hague application or represent me in the Hague hearing.

Q  But it was directly related to your desire to enforce your custody and placement rights as have been ordered by this Court?

A  Yes.

Q  About how much has it cost you to retain his services?

A  $8000 including, along with his attorneys fees, that is costing me $4500, and then I have also had to pay all of his expenses; when I have added up all of his expenses being hotel, lodging, travel, and my airline ticket, I have come up with a total of $8,000. So to answer your question, his actual attorney fees for his legal services have been $4500 but I have also had to pay for all of his expenses.

Q  Can you distinguish what you have paid in terms of his expenses?

A  Yes, $7,000.

Q  Does that include --

A  His attorneys fees, yes.

Q  Are you asking the Court to order the petitioner to reimburse you for those costs?

A  Yes.

THE COURT: Do we have an itemized list of all

10

of this?

MR. RICHARDSON:  No, I don't.

BY MR. WESSEL:

Q   Can you provide that?

A   Yes.

THE COURT:  I can't order that there be reimbursement without making a finding that they are reasonable, therefore, I have to look at them and see what they are.

MR. RICHARDSON:  A lot of this was done--the legal system down there, as you can imagine, is quite different than up here.  And things are done a lot differently down there as far as getting an actual statement from Jorge, I can try to get something from him; but there were a lot of hidden fees and under the table fees and cash in the airport and things that I probably won't be able to get receipts for but I can do my best and if not, at least I will document it.

THE COURT:  Submit it under affidavit.

BY MR. WESSEL:

Q   What are you asking the Court to order in relation to custody of Andrew?

A   As of right now, I would like to get--what I would like to have custody be is 50/50.

Q   Do you understand the distinction between placement and

11

custody?

A   Yes, I am sorry.  As far as custody, I would like sole legal custody but as far as legal placement, I would like 50 percent placement.

Q   Are you asking the Court to enter an order for child support?

A   Yes.

Q   What is your understanding as to Mariana's income?

A   I don't know.

Q   What has been her --

A   She works--I am not sure, I have not heard from her since August 3; but from previous history, she works for her father, he owns a company down there.

Q   How much does she make?

A   Relative to the same here, which would be in the $55,000 to $60,000 a year salary range.  Very similar to what she was making while she was employed at Hays Brakes, which was a previous employer here.

Q   Directing your attention to the tax exemptions for Andrew, what are you asking the Court to order?

A   Tax exemptions for the time that I can claim him, for 18 years--16 years, I guess, until he turns eighteen.

Q   Directing your attention to your financial disclosure statement, what property are you asking the Court to award to you?

12

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 33 of 68    Document 1-1

A My current home that I purchased after Mariana had left the marriage. Also half the value of her--not--half the value of the appreciation of her real estate in Mexico since we were married.

THE COURT: Have you prepared a proposed marital settlement agreement?

MR. WESSEL: I have not, your Honor.

MR. RICHARDSON: I don't know what the value of that property in Mexico is, I can't get it because obviously she's not here; and that would have been one of my discovery requests.

BY MR. WESSEL:

Q Are you requesting that the Court award you all of the property listed on your financial disclosure statement?

A Yes. There is also, I don't know if I can make it--if I made it in my statement--but Commissioner Frinzi, who I met at the temporary hearing, I told him that Mariana had, to my estimate, taken $17,000 that she had saved during the marriage, in cash; and I requested to get half of that money and Commissioner Frinzi didn't make a decision on that.

Q Are you asking this Court to order Mariana to pay you $8,500 in property division?

THE COURT: Could you tell me a little bit about that?

13

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 34 of 68    Document 1-1

MR. RICHARDSON: Sure. It is money that she had made since she returned here in her work at her employer. She never paid any bills or mortgages and that was one of the contentions of our marriage; and when she left, she sent a lot of it home to Mexico and she also took it with her. That was going to be one of the things that I was going to investigate during the discovery process but, of course, I can't now legally get her to submit bank statements or accounts. But--I was required during the marriage to pay mortgages, bills, and she thought she could take her money and just keep it in her account and then when she fled--we had separate bank accounts so --

THE COURT: When you say that you are legally required to pay certain things, are you talking about the results of a temporary hearing in front of a court commissioner or what are you talking about?

MR. RICHARDSON: I guess I was saying that during the marriage I paid all the bills with my own money that I made at my job in my account. And Mariana would mostly, I am assuming this, of course, would wire money back to Mexico or kept her own account; then the period from the temporary order hearing to when she fled in August, took the cash with her.

THE COURT: Do you have some proof that the

14

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 35 of 68    Document 1-1

$17,000 existed at the time she fled?

MR. RICHARDSON:  The only proof that I can probably try to provide would be the bills that I paid and the fact that she made a salary and deduct it from that.  I don't have copies of her accounts or statements but, as I mentioned, that was going to be my request during discovery, to get copies of her bank accounts--I know what bank accounts she has, she had three accounts, Stevenson, Wells Fargo, and A-B Federal[sic] Credit Union; and I was going to ask for copies of all her statements and then I could do the detective work myself.  But I don't have that information so I'm kind of--can just make the estimates that I am making.

BY MR. WESSEL:

Q    What is the basis for your estimate that there was $17,000 --

A    Her salary.

Q    Is your marriage irretrievably broken?

A    Yes.

MR. WESSEL:  I think that is all I have.

THE COURT:  Do you know whether or not your wife is currently pregnant?

MR. RICHARDSON:  No.

THE COURT:  There was one child born to the marriage?

15

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 36 of 68    Document 1-1

MR. RICHARDSON: Yes.

THE COURT: That was Andrew, born April 9, 2006?

MR. RICHARDSON: Yes.

THE COURT: Did you adopt any other children?

MR. RICHARDSON: No.

THE COURT: Anything from you, Mr. Friesler?

MR. FRIESLER: Just a couple which I think is going to be needed.

EXAMINATION BY MR. FRIESLER:

Q Mr. Richardson, the petitioner, your wife, has made some allegations against you of physical and emotional abuse; is there any truth to those allegations?

A No.

Q You deny all of them?

A Yes.

Q The petitioner left in the beginning of August?

A Yes.

Q Since that time, since the beginning of August, have you attempted either by telephone or e-mail to harass, cajole, or make any threats against your wife?

A No.

Q Have you made any attempts to contact her for the sole purpose of being able to see your son?

A Yes.

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 37 of 68    Document 1-1

Q What has been the result of--what type of communication?

A Three e-mails.

Q You have those e-mails?

A Yes.

Q Is your e-mail server set up such that you are able to determine whether or not the e-mail was received or not?

A I believe my server is--you can request, well, I have--her account is an Internet account, the account that I sent e-mails to. If I were to send an e-mail to her, I can request a reply back when she receives it. She can always--a window will pop up on her screen saying do you want to send a reply, and she can say no. I sent her in two of those e-mails a request for a reply--there is receipt and reply. I requested replies and have not gotten any.

Q But you never got a notification from the e-mail server that those e-mails were not received?

A Correct.

Q By that you would assume that they have been received and she refused to reply?

A Yes.

Q Have you had any contact with members of her family?

A No.

Q Whether here or down there?

A Well, I have not had contact; but when I sent Mariana

17

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 38 of 68    Document 1-1

those e-mails I also copied her father and her father's employment, he's the owner of the company.

Q Did you receive responses from him?

A No.

MR. FRIESLER: I have nothing further, Judge.

THE COURT: All right.

MR. WESSEL: I have a couple of follow-up questions.

REDIRECT EXAMINATION BY MR. WESSEL:

Q You testified that Mariana has accused you of physical and emotional abuse?

A Yes.

Q Prior to her--or to August, were you in counseling with her?

A Yes.

Q And did she make those kinds of allegations in counseling with her?

A No.

Q Have you been given any guidance through counseling as to whether or not Mariana may suffer from a mental illness?

A Yes.

Q What mental illness do you believe she suffers from?

A Borderline personality disorder and manic depression.

MR. WESSEL: That is all I have.

18

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 39 of 68    Document 1-1

THE COURT: Why do you believe that she suffers from those?

MR. RICHARDSON: We were in marriage counseling, the psychologist, Dr. Wayne Harder, told me that he had diagnosed her with that to help me understand how to deal with that disorder and how to cope with that disorder in our marriage. And also on the bills, they were sent to our home and on the bill there were diagnostic codes; and since we were both on the bill--our names were both on the bill, I was able to review the bills and see the diagnostic codes. And the diagnostic code for Mariana was for borderline personality disorder and also manic depression.

THE COURT: My clerk just handed me a fax, and I will let everybody read it, it is from Ms. Saldivar; and she asked to appear by phone but doesn't include a phone number so I don't know how I could facilitate her appearance by phone. She does indicate that she received the notice of the order to appear for the hearing today.

She also goes on to express the concerns about abuse that the attorneys had mentioned before, these were things that I hadn't had any occasion to hear a lot about; I only saw this case once or twice before the child was gone. I will give this to you,

19

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 40 of 68    Document 1-1

Mr. Richardson, then the attorneys.

The record should reflect that if there were a phone number on that--or is there one on the fax page? Nope. If there were a phone number I would be happy to facilitate her request.

MR. RICHARDSON: I read it, your Honor.

THE COURT: You can take it to them.

MR. RICHARDSON: A quick response to the letter would be that it doesn't surprise me, I have heard that now since she fled through her petition she filed in Mexico. It is new in the sense that I have never heard that before, during the marriage or prior to August 3; so this is a defense that she's trying to use to flee the country and this Court, I think, has seen that there has been no evidence or claims of domestic abuse prior to this situation.

Further, I would like to add that one of the symptoms of borderline personality disorder is these wild and baseless accusations. My psychologist, Dr. Wayne Harder, mentioned that; he also believes that Mariana is in denial and that a lot of times they will use this as a way to get back at the person who they feel has abandoned them or trying to hurt them with accusations and claims--baseless claims.

FURTHER DIRECT EXAMINATION BY MR. WESSEL:

20

Q   In her letter she suggests that you were jeopardizing Andrew's safety and health and the integrity of the child. How do you respond to those allegations and can you briefly describe the type of care that you provided for Andrew during the separation as far as --

A   Couldn't be further from the truth as far as her accusations, they are all false. I am a first time parent but I read a lot, and it is a natural instinct to care and nurture for your son and I did the best that I could.

I love him to death, as of right now I am doing everything I can to care for him and provide the love and nurturing he needs. I am concerned, as I said earlier, with Mariana's serious mental illness, for his safety and I am continuing to try to provide some kind of care, being involved in Andrew's life to make sure he is cared for. So, I will if you want me to but--did I feed him formula every three hours or change his diapers every two hours, I can respond if you want but I don't know if that is --

Q   I would like you to address an issue related to secondhand smoke, what if anything did you do to protect Andrew from that?

A   I smoked previously. I have not smoked since May, quit smoking May of 2007. I never smoked around Andrew, if

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 42 of 68    Document 1-1

Andrew is in my care I wouldn't smoke or if I did smoke, my parents or sister would have Andrew and I would step away from Andrew to have a cigarette. Never smoked in the house, never smoked in the car, never smoked around Andrew. Then, like I said, that was in May so from May to August, as I mentioned earlier, I quit smoking and as of today I don't smoke.

Q It also mentions alcoholism, did you address the use of alcohol in counseling with Mariana and Dr. Harder?

A Dr. Harder--Mariana--well, Dr. Harder had mentioned that he had some discussions as far as regards to my use of alcohol and whether or not it was a concern. I was working with him and talking about how much I used alcohol, how much I drank and whether or not it warranted or rose to the level of alcohol abuse and/or alcoholism.

Q Did he have feedback from Mariana as to her observations of your use of alcohol?

A As you can see from her letter, I am not sure what she told Dr. Harder; there was--at the later stages of our therapy, Dr. Harder started seeing us individually. It was at those later stages of our therapy that, I believe, Mariana was making wild claims about my alcohol use.

Dr. Harder was concerned and he brought it up

22

with me, but when I was able to address it with Dr. Harder he was not as concerned any more. So Dr. Harder at the time wasn't concerned, didn't think it was a problem, had no concern about my parenting skills or the fact of any issue that alcohol would have in raising Andrew. He was very concerned about Mariana though, her mental health as far as raising a child and being a parent for Andrew.

MR. WESSEL: I have nothing further based on that.

THE COURT: Anything else from you?

MR. FRIESLER: I can address all of that in my comments to the Court.

THE COURT: Thank you, Mr. Richardson.

(Witness excused.)

THE COURT: Whenever you are ready, Mr. Friesler.

MR. FRIESLER: Thank you, your Honor. As guardian ad litem for the minor child, Andrew, in this case, I met with both parties individually--alone and I then subsequently met with each party at their home, looking and observing their relationships with their children.

I also was made aware of the allegation or allegations that Ms. Farah was making about

33

Mr. Richardson's conduct toward her and her concern about the children; and therefore, asked for and eventually received authorizations from both Mr. Richardson and Ms. Farah. The ones from Ms. Farah were very difficult to obtain.

I should also advise the Court and I know--I think that there is a letter to the extent in the file that early on I addressed the issue as I always do with both parties regarding the law in the state of Wisconsin as it relates to the removal of the child from the Milwaukee County area.

I was especially concerned about this with Ms. Farah right from the beginning because of certain comments she made to me as to what she felt were requirements to raise her son, including going back to Mexico. As a result of that conversation, I received a letter from her then counsel accusing me of prejudice. We wrote many letters, I think--a number of letters back and forth to the Court and the matter was subsequently resolved.

I sent letters and made phone calls to all of the doctors, I have received nothing from any of Ms. Farah's medical health providers or mental health providers including from the Battered Women's Coalition where she received counseling and made the allegations

24

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 45 of 68    Document 1-1

of this kind of conduct, although they were sent the authorizations and agreed to send them.

THE COURT: You know that they received the --

MR. FRIESLER: Yes, because I talked to them by phone. I also talked to her psychologist by phone who indicated to me that he would send them as well, I got nothing. I did receive medical files from Dr. Leach, who was Andrew's pediatrician, and this letter was dated in April of 2--I am sorry, dated--undated but sent sometime after my appointment in 2007, which indicated that Andrew was demonstrating normal growth and development and didn't address any issue of psychological or physical or mental abuse of any type.

I received a large packet of documents from Dr. Wayne Harder, who is a Ph.D. psychologist, which included copies of his reports, meeting notes, histories, treatment plans, progress notes, the whole thing. These notes do support the statements made today about the wife suffering from depression and also from borderline personality.

He did meet with them, according to his letter to me, in June; indicates Trevor came to him in January of 06, he had seen him previously; he saw Mariana on seven occasion, he saw Trevor 38 times, and both of them eight. My impression was that Mariana did not make much

25

progress working on her issues, tended to focus way too much on Trevor with a tendency to come to sessions to complain rather that address the basis of her own problems.

I do believe that there is--I do believe there is no validity to the allegations of abuse. I talked to her about it several times and it seemed to me that she was, for whatever reason, overly sensitive and any time a voice would get raised it was an allegation of abuse. I guess in my household I would have been thrown in jail for life every time either my wife or I raised our voices, that would happen.

I don't believe there is any abuse here either mental or physical. I believe that, whereas both parties are fit, I think, to have custody and placement of Andrew, I think, based upon Ms. Farah's actions and her blatant, clear, intentional violation of the statutes, my admonitions to her, and also court orders, she has demonstrated an inability to cooperate with the father, which is one of the bases upon which the Court can deviate from joint custody.

And I would suggest, therefore, that the custody be granted solely to Trevor Richardson; and that placement be ordered with him subject to further review if and when the child is returned and Ms. Farah returns

26

to the state of Wisconsin and demonstrates an ability to abide by the law. Until that time, any placement with her should be held open.

I should also indicate to the Court that I have sent one statement to the parties for work done between my appointment and August, the end of August 07; the amount of that bill was $2,700. I applied the $1,500 the parties paid, $750 each; which left a balance of $1,200 and I allocated to them $600 apiece.

I have unbilled, that will be billed this month through the end of the year, an additional 13.5 hours which, at my rate I agreed to which was $175 an hour, comes to $2,350. I would ask that that be ordered to be paid one-half by each. And I have prepared an order for payment that I submit to the Court for that.

THE COURT: Does that conclude your remarks?

MR. FRIESLER: Yes.

THE COURT: I would note that in going through the file I see that Ms. Saldivar did complete the parental education requirement, so we have all bases touched here. All right, with respect to the divorce, I make the following findings. The petitioner and the respondent were married on August 9, 2004, in Menomonee, Michigan. This is a marriage of three years and almost five months.

One child has been born to the marriage, a son Andrew, born April 9, 2006. Summons and petition were filed February 16, 2007; immediately prior to that date boat parties had lived in Milwaukee County for 30 days an the state of Wisconsin for six months. Both parties have filed financial disclosure statements, the respondent has updated his today on the record. There is a certificate of compliance, there is compliance with the parental education requirement; the Court does have jurisdiction to proceed.

Based on the testimony, I find the marriage to be irretrievably broken. I find that the petitioner's income--or respondent's income is as set forth in his financial declaration. There is no proposed marital settlement agreement, which is common in Milwaukee, I will therefore use the financial disclosure statement filed by the respondent. This does deal with all of the debts of the marriage?

MR. RICHARDSON: Except $17,000.

THE COURT: That isn't technically a debt. So we have a Bank of America credit card, is this money that--or is this balance post separation or pre-separation?

MR. RICHARDSON: That balance was at separation.

THE COURT: At the time you separated there was a balance of $5397?

MR. RICHARDSON: Yes.

THE COURT: The Discover, AT&T Universal, Sprint, and Direct TV are small, look like they are paid on a monthly basis?

MR. RICHARDSON: Those are the debts that were at the time of the separation; she left--minor but she had left in February, she didn't pay those bills the previous month.

THE COURT: I talked to you a little bit about the Jorge Cruz Cordero $8,000, I need more than just the assertion that all of your costs related to Ms. Saldivar's disappearance total $8,000; I need some basis to address that so I will not address that as part of the divorce judgment. You have got USAA, I am not sure what that is, that is a credit card for $2000?

MR. RICHARDSON: Yes.

THE COURT: Was that marital?

MR. RICHARDSON: No, that was post separation.

THE COURT: Those are your responsibility. Then I will order with respect to the debt that--the Bank of America, Discover, AT&T Universal, Sprint, Direct TV all be split equally between the parties. USAA credit card bill is respondent's debt and any

credit cards or debts that have been assumed by the petitioner post separation are hers.

MR. RICHARDSON: I think a lot of the expenses previously incurred have been because of her actions, I would like to make her accountable.

THE COURT: I doubt that Mr. Friesler will agree with you because the likelihood of his recovering her half --

MR. RICHARDSON: I understand that and I would be willing to pay half now.

THE COURT: All right. With respect to the homestead, I believe you said that that was--it is titled jointly, I thought you said you had gotten that after she left.

MR. RICHARDSON: I did say jointly? I apologize, that is the home I bought after--I bought that home in May.

THE COURT: All right, you paid $145,000 but you think it is now worth 142?

MR. RICHARDSON: Yes.

THE COURT: I will award to you the real estate, you are the only one on the mortgage?

MR. RICHARDSON: Yes.

THE COURT: Okay. The USAA 401K, that is yours?

MR. RICHARDSON: Yes.

THE COURT: I will award to the respondent his retirement account and any retirement accounts that the petitioner has in her name I will award to her. You disclosed two automobiles here, a Volkswagen and Mercedes Benz, are both of those here?

MR. RICHARDSON: Yes, those were both owned by me previously.

THE COURT: I will award both of those automobiles to you, there are no liens on those. The USAA bank account that you have disclosed at the top of page 4, are those in your name solely?

MR. RICHARDSON: Yes.

THE COURT: You said you had separate accounts so Ms. Saldivar had her own accounts which she presumably had closed when she left. I will award to the respondent the two accounts, USAA, one with number 35478268, one is 25478357. You have here 200 shares of Ford and 1 USAXF. Tell me about those investments.

MR. RICHARDSON: Ford is just stock that I bought.

THE COURT: But did you buy it during the marriage?

MR. RICHARDSON: No, that was after the separation, the USAXF was also bought after the

31

separation.

THE COURT: I will then, based on your statement, award those assets to you; at least you have something available should you need it to pay Mr. Friesler. All personal property in the respondent's possession is awarded to him; likewise, personal property in the petitioner's possession is awarded to her.

With respect to the alleged $17,000, I am--I don't think that I have enough facts or concrete evidence to address that in that it is simply the respondent's assertion that, based on her income, she must have had $70,000. She may have had but I can't issue a court order based upon those kinds of calculations.

I will not foreclose, and I have no idea legally if I can do this, these are assets which existed during the marriage, allegedly, and had not been disclosed at the time of divorce; and therefore, I think they would be an appropriate subject for reopening the judgement of divorce if Ms. Saldivar appears.

The guardian ad litem fees, I will order that both parties pay 50 percent of the outstanding guardian ad litem fees. I will, however, find that because the petitioner has defaulted today and has declined to

32

cooperate with discovery or provide any enlightening testimony that, should she reappear, that the Court would entertain a motion if necessary to reopen the judgement with respect to her paying more than half of the guardian ad litem fees because I agree that probably if she had stayed here and gone through the divorce it wouldn't have turned out like this.

MR. WESSEL: Your Honor, if I may, would the Court entertain entering an order that she reimburse Mr. Richardson for any payments he makes to the guardian ad litem or --

THE COURT: Here is the problem with that. If she had not absented herself, I can imagine this trial; it would have gone on for at least a couple of days. We would have heard from psychologists and psychiatrists, so I think it would have been more expensive to have gone through trial than it is right now. That is my take on it.

So, if there is information--evidence that becomes available in the future that indicates that there has been some fraud or misrepresentation or if there has been a mistake of some kind, any of the 806.07 kinds of bases, the Court would be prepared to entertain a motion to that effect.

With respect to the marital child, because of

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 54 of 68    Document 1-1

the peculiar facts in this case, I will--and I have listened carefully to the guardian ad litem's recommendation; he was in a position to have obtained information that the Court didn't have before this. I will be prepared today to then order sole custody to the respondent at this time.

Primary placement to the respondent, any placement to the petitioner will be held open pending a hearing on placement issues. Just because--I am going to hold child support open, but, certainly, if she ever appears there should be an order for child support. But I don't see the merits right now and I have to have some basis for calculating child support.

We didn't talk about maintenance, I am going to assume that you are waiving maintenance, Mr. Richardson.

MR. RICHARDSON: Yes, but is there any way that I can be--my expenses aren't going to stop today; and tracking down, I was hoping that child support would be helping me down the road --

THE COURT: You are mumbling.

MR. WESSEL: Let me address that, your Honor. I did hear his comments and I think his primary concern should not be focused on child support but I think he is asking the Court to retain jurisdiction for his ongoing

34

expenses to afford the placement and custody order as it relates to the costs.

THE COURT: This case is assigned to this Court, I don't know that I have to specifically retain jurisdiction. Let me ask you this question, both of you, Mr. Friesler, I had told the clerk to recommend to you that you consult with David Blumberg. Did you ever do that?

MR. FRIESLER: I don't remember getting that but I have talked to David about situations like that and that is how we got on the process that we are on --

THE COURT: He is also fluent in Spanish but extremely knowledgeable about international issues, he teaches all over the state on this point.

MR. WESSEL: Your Honor, I can address that; Attorney Blumberg referred us to Attorney Jorge Cruz Cordero in Mexico with some caveats that he was untested, that was the best that he could come up with.

THE COURT: Okay, thank you.

MR. WESSEL: And we consulted at some length with him and he felt that at this point there was nothing that he could add further in this case.

THE COURT: Okay.

MR. FRIESLER: The only other thing that I would add, your Honor, is one, I think I should not be

35

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 56 of 68    Document 1-1

discharged at this time because my role as guardian ad litem may arise within the next procedures, especially as relates to the allegations of abuse. I think the judgment, or the findings anyway, should also contain some finding that there is no support for those allegations. Because I think these findings --

THE COURT: I have a problem with that because all I have is your representation, I don't have any evidence--I would like to be able to be helpful but I think I need some basis for making findings.

MR. WESSEL: There is the evidence and testimony of Mr. Richardson that he denies those things.

THE COURT: I am happy to say that --

MR. RICHARDSON: Also on the temporary order hearing she makes a statement that there has been no domestic abuse.

THE COURT: I am not going to--I think Courts have to be careful about maintaining their own credibility. If you say things that there really isn't any factual support for, you lose any respect for the portions which you have facts for. There is no evidence in this record that there has been any kind of abuse by Mr. Richardson.

There is the guardian ad litem, who has been privy to some records that the Court hasn't, has

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 57 of 68    Document 1-1

expressed the opinion that there was no abuse. I think that is the best I can do because I can't independently examine facts and come to a conclusion.

MR. WESSEL: Can I include those facts --

THE COURT: Yes, you can put that in.

MR. FRIESLER: I think that is fine, your Honor.

THE COURT: All right. Maintenance is denied to the petitioner, I will hold open the maintenance to the respondent for a period of three years simply relating to the expenses of attempting to enforce his order. It may not be that maintenance is the appropriate vehicle for doing that but it wouldn't be child support either. So I am going to hold maintenance open for that specific purpose.

Child support is not going to--I am concerned with the mechanics of this. If we order child support, there has to be a form filled out and it has to go to child support enforcement and if they don't have employer information and all of that, I don't know that they do anything with it. So I don't know what the effect would be of ordering child support at this point; but I can't order child support now because he doesn't have the child. So child support is held open at this time.

37

Based upon all of the foregoing findings, I will find the marriage to be irretrievably broken and I will grant the respondent a judgment of absolute divorce. You are completely and finally divorced today, however, you cannot legally remarry until six months from today's date; if you should remarry before the six months have passed, the marriage will be null and void. Do you understand?

MR. RICHARDSON: Yes.

THE COURT: All right, good luck, Mr. Richardson, I know that I will continue to see you.

MR. FRIESLER: Should the judgment contain the provision of my retaining --

THE COURT: Yes, you can retain your--I am sure you will be careful about the fees.

MR. FRIESLER: I will do nothing until such time as I hear that there is something to do; but in case I could be helpful in Mexico or needed when the child comes back, it is probably a good idea.

MR. WESSEL: One minor matter, your Honor, the Court suspended Mr. Richardson's child support effective sometime in September; he would ask that that suspension be retroactive to the date the child was removed to Mexico, which is August 3.

THE COURT: Logically, that certainly makes

38

sense; sure, I will do that but we have to fill out one of those forms, an interim financial.

MR. FRIESLER:  Thank you, your Honor.

(Hearing concluded.)

STATE OF WISCONSIN )

) S.S.

MILWAUKEE COUNTY )

I, CHRISTINE CHARETTE, Official Court Reporter, do hereby certify that I have reported the foregoing proceedings; that the same is true and correct as reflected by my original machine shorthand notes taken at said time and place.

Dated this 26th day of February, 2006.

Christine Charette.

INFORMACIÓN CONFIDENCIAL.





# SRE

SECRETARÍA DE
RELACIONES EXTERIORES

| INFORMACIÓN CONFIDENCIAL. | |
|---|---|
| Fecha de clasificación: | 27 de Diciembre de 2012 |
| Unidad Responsable: | Dirección General de Protección a Mexicanos en el Exterior |
| Fundamento Legal: | Ley Federal de Transparencia y Acceso a la Información Pública Gubernamental Art. 18, fracción II. |
| Partes Clasificadas: | Todo y anexos |
| Rúbrica Titular de la Unidad Administrativa | Embajador Roberto Rodríguez Hernández |

Número: PME-115737.12

México D.F. a 12 de diciembre 2012

Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154

Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

Jesus Castellanos Malo

Magistrado Presidente de la Primera Sala Civil

del Poder Judicial del Estado de Querétaro

Calle Pasteur # 4, Col. Centro

Querétaro, Querétaro, C.P. 76000

Presente.

Se hace referencia a la resolución de fecha 19 de septiembre de 2012 emitida por el Lic. en D. Everardo Pérez Pedraza, Juez Cuarto de lo Familiar del Distrito Judicial de Santiago de Querétaro, en el Estado de Querétaro, relativa a la solicitud de restitución internacional del menor, ANDREW de apellidos RICHARDSON FARAH, que presentó la Autoridad Central de los Estados Unidos de América con base en la Convención de la Haya Sobre los Aspectos Civiles de la Sustracción Internacional de Menores.

Sobre el particular, me permito puntualizar lo siguiente:

1. - Que en aplicación de la Constitución Política de los Estados Unidos Mexicanos, fue introducido a este país el Convenio de La Haya sobre los Aspectos Civiles de la Sustracción Internacional de Menores, por la vía legislativa, ello con el fin de incorporar al derecho interno los derechos y obligaciones derivados del mismo. Por tanto su contenido es derecho positivo vigente y su aplicación es obligatoria, ya que según lo dispuesto por el artículo 133 de la Constitución Política de los Estados Unidos Mexicanos, los tratados internacionales celebrados por el Ejecutivo Federal, aprobados por el Senado de la República, son Ley Suprema de toda la Unión, y de conformidad con los siguientes criterios jurisprudenciales se ubican jerárquicamente abajo de la Constitución Federal y por encima de las leyes generales, federales y locales:

SUPREMACÍA CONSTITUCIONAL Y ORDEN JERÁRQUICO NORMATIVO, PRINCIPIOS DE INTERPRETACIÓN DEL ARTÍCULO 133 CONSTITUCIONAL QUE LOS CONTIENE. En el mencionado precepto constitucional no se consagra

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 62 of 68    Document 1-1

EXHIBIT D

 

SECRETARÍA DE
RELACIONES EXTERIORES

- 2 -

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

garantía individual alguna, sino que se establecen los principios de supremacía constitucional y jerarquía normativa, por los cuales la Constitución Federal y las leyes que de ella emanen, así como los tratados celebrados con potencias extranjeras, hechos por el presidente de la República con aprobación del Senado, constituyen la Ley Suprema de toda la Unión, debiendo los Jueces de cada Estado arreglarse a dichos ordenamientos, a pesar de las disposiciones en contrario que pudiera haber en las Constituciones o en las leyes locales, pues independientemente de que conforme a lo dispuesto en el artículo 40 de la Constitución Política de los Estados Unidos Mexicanos, los Estados que constituyen la República son libres y soberanos, dicha libertad y soberanía se refiere a los asuntos concernientes a su régimen interno, en tanto no se vulnere el Pacto Federal, porque deben permanecer en unión con la Federación según los principios de la Ley Fundamental, por lo que deberán sujetar su gobierno, en el ejercicio de sus funciones a los mandatos de la Carta Magna, de manera que si las leyes expedidas por las Legislaturas de los Estados resultan contrarias a los preceptos constitucionales, deben predominar las disposiciones del Código Supremo y no las de esas leyes ordinarias, aun cuando procedan de acuerdo con la Constitución Local correspondiente, pero sin que ello entrañe a favor de las autoridades que ejercen funciones materialmente jurisdiccionales, facultades de control constitucional que les permitan desconocer las leyes emanadas del Congreso Local correspondiente, pues el artículo 133 constitucional debe ser interpretado a la luz del régimen previsto por la propia Carta Magna para ese efecto.

Amparo en revisión 2119/99. 29 de noviembre de 2000. Cinco votos. Ponente: Olga Sánchez Cordero de García Villegas. Secretaria: Leticia Flores Díaz.

Amparo directo en revisión 1189/2003. Anabella Demonte Fonseca y otro. 29 de octubre de 2003. Unanimidad de cuatro votos. Ausente: Humberto Román Palacios. Ponente: Juan N. Silva Meza. Secretario: Luis Fernando Angulo Jacobo.

Amparo directo en revisión 1390/2003. Gustavo José Gerardo García Gómez y otros. 17 de marzo de 2004. Unanimidad de cuatro votos. Ausente: Humberto Román Palacios. Ponente: Humberto Román Palacios; en su ausencia hizo suyo el asunto José Ramón Cossío Díaz. Secretario: Jaime Salomón Hariz Piña.

Amparo directo en revisión 1391/2003. Anabella Demonte Fonseca. 31 de marzo de 2004. Unanimidad de cuatro votos. Ausente: Humberto Román Palacios. Ponente: Olga Sánchez Cordero de García Villegas. Secretaria: Ana Carolina Cienfuegos Posada.

Amparo en revisión 797/2003. Banca Quadrum, S.A. Institución de Banca Múltiple. 26 de mayo de 2004. Unanimidad de cuatro votos. Ausente: Humberto Román Palacios. Ponente: Juan N. Silva Meza. Secretario: Luis Fernando Angulo Jacobo.

Tesis de jurisprudencia 80/2004. Aprobada por la Primera Sala de este Alto Tribunal, en sesión de veintidós de septiembre de dos mil cuatro.

Registro No. 180240, Localización: Novena Época, Instancia: Primera Sala, Fuente: Semanario Judicial de la Federación y su Gaceta, XX, Octubre de 2004, Página: 264, Tesis: 1a./J. 80/2004, Jurisprudencia, Materia(s): Constitucional

TRATADOS INTERNACIONALES. SON PARTE INTEGRANTE DE LA LEY SUPREMA DE LA UNIÓN Y SE UBICAN JERÁRQUICAMENTE POR ENCIMA DE LAS LEYES GENERALES, FEDERALES Y LOCALES. INTERPRETACIÓN DEL ARTÍCULO 133 CONSTITUCIONAL. La interpretación sistemática del artículo 133 de la Constitución Política de los Estados

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 63 of 68    Document 1-1

 

**SRE**
SECRETARÍA DE
RELACIONES EXTERIORES

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

Unidos Mexicanos permite identificar la existencia de un orden jurídico superior, de carácter nacional, integrado por la Constitución Federal, los tratados internacionales y las leyes generales. Asimismo, a partir de dicha interpretación, armonizada con los principios de derecho internacional dispersos en el texto constitucional, así como con las normas y premisas fundamentales de esa rama del derecho, se concluye que los tratados internacionales se ubican jerárquicamente abajo de la Constitución Federal y por encima de las leyes generales, federales y locales, en la medida en que el Estado mexicano al suscribirlos, de conformidad con lo dispuesto en la Convención de Viena Sobre el Derecho de los Tratados entre los Estados y Organizaciones Internacionales o entre Organizaciones Internacionales y, además, atendiendo al principio fundamental de derecho internacional consuetudinario 'pacta sunt servanda', contrae libremente obligaciones frente a la comunidad internacional que no pueden ser desconocidas invocando normas de derecho interno y cuyo incumplimiento supone, por lo demás, una responsabilidad de carácter internacional."

Tesis número P. IX/2007, emitida por el Tribunal Pleno de la Suprema Corte de Justicia de la Nación, con registro 172,650, visible a foja 6, Tomo XXV, abril de 2007, publicada en el Semanario Judicial de la Federación y su Gaceta.

2. - Es importante destacar que en el caso particular al que se hace referencia, la retención ilícita del menor fue realizada a partir del tres de agosto de dos mil siete, y la solicitud del señor TREVOR ANDREW RICHARDSON fue presentada en fecha diecisiete de agosto de dos mil siete, es decir, tan solo catorce días después, por lo que el caso se encuadra en el supuesto contenido en el primer párrafo del artículo 12 de la Convención de la Haya el cual señala que: "[cuando]...hubiera transcurrido un periodo inferior a un año desde el momento en que se produjo el traslado o retención ilícitos, la autoridad competente ordenará la restitución inmediata del menor" y sólo en el caso de que se hubieren iniciado los procedimientos después de la expiración del plazo señalado podría el juzgador adentrarse al estudio de la hipótesis segunda de dicho artículo relativa a la integración del menor a su nuevo medio, como erróneamente lo hizo en el considerando tercero de la resolución recurrida, sirviendo de apoyo para ello la siguiente tesis:

INTEGRACIÓN DEL NIÑO A SU NUEVO AMBIENTE, COMO MOTIVO PARA NEGAR SU RESTITUCIÓN. SÓLO ES INVOCABLE CUANDO EL PROCEDIMIENTO INICIA DESPUÉS DE UN AÑO DESDE LA SUSTRACCIÓN O RETENCIÓN ILÍCITAS. Del artículo 12 de la Convención sobre los Aspectos Civiles de la Sustracción Internacional de Menores se hacen patentes los distintos efectos de la determinación que el Juez del Estado requerido debe adoptar en un procedimiento de restitución de menor, según si dicho procedimiento inició antes o después de un año, desde que la sustracción o retención ilícitas tuvieron lugar: en el primer caso, se debe decretar la restitución inmediata; y en el segundo, puede negarse la restitución si está demostrado que el menor ha quedado integrado a su nuevo ambiente. Lo anterior, pues se consideró razonable un año como plazo para que el interesado iniciara el procedimiento de restitución, pero se admite su inicio posterior en atención a diversas circunstancias que pueden presentarse en la realidad que pudieran retrasar tal gestión, como las dificultades para localizar al menor, aunque en este último caso, se considera más perjudicial el retorno del niño, si éste ya se adaptó al lugar donde ahora se encuentra. Por tanto, la consideración acerca de si el niño ya está adaptado al nuevo ambiente, sólo cabe invocarla cuando el procedimiento hubiera iniciado después de ese plazo, y en cambio, la dilación en la resolución

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 64 of 68    Document 1-1

 

SECRETARÍA DE
RELACIONES EXTERIORES

− 4 −

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

de la restitución no debe ser motivo para legitimar la ilicitud de la sustracción, pues el posible retraso en la acción de las autoridades competentes, no debe perjudicar los intereses de las partes amparadas por la convención.

Asimismo, es de destacar que en la citada Convención ya se encuentra inmerso el interés superior del menor, por lo que éste no debe ser invocado como motivo de una negativa de retorno, ya que precisamente uno de los objetivos del instrumento internacional en cita es salvaguardar los intereses y derechos mínimos fundamentales, mediante el retorno de los menores a su lugar de residencia habitual; el hacer una aplicación errónea o selectiva de la Convención atenta en contra de dicho interés, en concordancia con la siguiente tesis:

SUSTRACCIÓN INTERNACIONAL DE MENORES. EL INTERÉS SUPERIOR DEL NIÑO ESTÁ INMERSO EN LA CONVENCIÓN INTERNACIONAL QUE LA REGULA. Del análisis de la Convención sobre los Aspectos Civiles de la Sustracción Internacional de Menores, se advierte que para resolver sobre la procedencia de la restitución de un menor, o para negarla, el Juez respectivo debe atender a los supuestos establecidos en dicha convención, sin necesidad de invocar el interés superior del menor, como motivo distinto o al margen de los supuestos que ahí se establecen, pues debe considerarse precisamente que, al emitir esa normativa, la comunidad internacional ya tuvo en cuenta dicho interés superior. En efecto, el interés superior del niño, que se refleja en el cuidado diferenciado y especial hacia la protección de sus derechos fundamentales de alimentación, vivienda, recreo, salud y educación, para lograr su óptimo desarrollo físico, mental, espiritual, moral y social, está inmerso en la convención mencionada, porque su emisión obedece a la problemática de multiplicación de sustracciones y retenciones ilegales internacionales de menores, para evitar que los niños sufran los perjuicios que acarrea cambiarlos del lugar de su residencia habitual, y de las personas de su familia, para lo cual se establece su restitución inmediata, ante la comprobación de su sustracción o retención ilegales; y también se atendió a dicho interés al establecer los casos en que procede negar la restitución, que como son de excepción deben interpretarse restrictivamente, pues se refieren a la inexistencia del derecho que se trata de proteger, evitar el peligro psíquico o físico que pueda representar la restitución, la integración del menor al nuevo ambiente, la prueba de su traslado a un Estado distinto, o cuando no lo permitan los principios fundamentales del Estado requerido, en materia de protección a los derechos humanos y libertades fundamentales. De esa manera, se puede concluir que, en materia de sustracción y restitución de menores, la mejor forma de proteger su interés superior es decretando su restitución inmediata, cuando proceda, y ceñirse a los supuestos de excepción ahí admitidos.

Registro No. 165377, Localización: Novena Época, Instancia: Tribunales Colegiados de Circuito, Fuente: Semanario Judicial de la Federación y su Gaceta, XXXI, Enero de 2010, Página: 2239, Tesis: I.4o.C.253 C, Tesis Aislada, Materia(s): Civil.

CUARTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 766/2008. 19 de marzo de 2009. Unanimidad de votos. Ponente: Leonel Castillo González. Secretaria: Mónica Cacho Maldonado.

3. - Por otro lado, cabe manifestar que el artículo 13 de la Convención en cita establece que en caso de oposición a la

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 65 of 68    Document 1-1

 

**SRE**
SECRETARÍA DE
RELACIONES EXTERIORES

- 5 -

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

restitución, compete a quien se opone acreditar de manera fehaciente las excepciones que indica dicho artículo, ya que de la lectura de la misma convención y del criterio citado en líneas inferiores es a la parte oponente a quien le recae la carga de la prueba por mandato legal.

Sobre el particular, es importante destacar que dicha lista de excepciones es privativa, es decir, no admite suplencia por la deficiencia de quien se opone, sino por el contrario, deberá ordenarse la restitución al no existir oposición fundada, y sólo de manera excepcional podría el juzgador de manera oficiosa oponerse, siempre y cuando dicha oposición guarde relación con alguna de las excepciones enumeradas, por lo que las cuestiones migratorias a las que hace alusión el juzgador en sus considerandos, no guardan ninguna relación con el procedimiento de restitución y por tanto no pueden motivar la negativa de retorno, tal como lo refieren los siguientes criterios:

CONVENCIÓN SOBRE LOS ASPECTOS CIVILES DE LA SUSTRACCIÓN INTERNACIONAL DE MENORES. SU FINALIDAD. La finalidad principal que persigue la Convención sobre los Aspectos Civiles de la Sustracción Internacional de Menores es garantizar la restitución inmediata del menor trasladado o retenido de manera ilícita en cualquier Estado hacia el Estado donde tenía su residencia habitual, por lo que la regla general es la devolución inmediata del menor y toda excepción a esta regla ha de tener justificación en alguno de los motivos que, casuísticamente, enumeran sus artículos 12 y 13, sin que pueda considerarse una lista abierta, susceptible de ampliación, pues interpretarlo así representaría un obstáculo para lograr la referida finalidad.

Registro No. 165068, Localización: Novena Época, Instancia: Tribunales Colegiados de Circuito, Fuente: Semanario Judicial de la Federación y su Gaceta, XXXI, Marzo de 2010, Página: 2960, Tesis: II.3o.C.77 C, Tesis Aislada, Materia(s): Civil

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEGUNDO CIRCUITO.

Amparo en revisión 225/2009. **\*\*\*\*\*\*\*\***. 8 de octubre de 2009. Mayoría de votos. Disidente: Juan Manuel Vega Sánchez. Ponente: Felipe Alfredo Fuentes Barrera. Secretaria: Benilda Cordero Román

CONVENCIÓN SOBRE LOS ASPECTOS CIVILES DE LA SUSTRACCIÓN INTERNACIONAL DE MENORES. CARGA DE LA PRUEBA DE QUIEN SE OPONE A LA RESTITUCIÓN DE UN MENOR. Del artículo 13 de la Convención sobre los Aspectos Civiles de la Sustracción Internacional de Menores se advierte que quien se oponga a la restitución de un menor tiene la obligación de demostrar las causas en que hace descansar esa oposición, de donde se sigue, que éstas no son de aplicación automática y, en principio, a esta parte le corresponde la carga de la prueba. De manera excepcional, cuando el juzgador natural en salvaguarda del interés superior del niño, ordena recabar pruebas oficiosamente, deben estar vinculadas con alguna de las causas de oposición que enumera el citado artículo 13 y su desahogo debe ajustarse al plazo de seis semanas que el juzgador tiene para resolver, según lo indica el artículo 11 de la convención en comento.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEGUNDO CIRCUITO.

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 66 of 68    Document 1-1

 

SRE
SECRETARÍA DE
RELACIONES EXTERIORES

– 6 –

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

Registro No. 16507, Localización: Novena Época, Instancia: Tribunales Colegiados de Circuito, Fuente: Semanario Judicial de la Federación y su Gaceta, XXXI, Marzo de 2010,Página: 2928, Tesis: II.3o.C.78 C, Tesis Aislada, Materia(s): Civil

Amparo en revisión 225/2009. ▬▬▬▬▬. 8 de octubre de 2009. Mayoría de votos. Disidente: Juan Manuel Vega Sánchez. Ponente: Felipe Alfredo Fuentes Barrera. Secretaria: Benilda Cordero Román.

4. – Con relación a la práctica de exámenes psicológicos, éstos únicamente permiten acreditar que el menor se encuentra bien en México, lo cual de ninguna manera podría interpretarse en sentido contrario de retornar a Estados Unidos, ni resulta en la improcedencia de la restitución, de conformidad con el siguiente criterio

PERMANENCIA DE UN NIÑO DE CORTA EDAD CON LA MADRE. NO ES UN DERECHO FUNDAMENTAL QUE PERMITA NEGAR SU RESTITUCIÓN. De lo establecido en el artículo 4o. constitucional, en relación al artículo 20 de la Convención sobre los Aspectos Civiles de la Sustracción Internacional de Menores, se puede colegir que para el Estado mexicano, la preferencia por la permanencia de un niño de corta edad con su madre no es un derecho fundamental y, por tanto, no puede ser invocado con base en el segundo precepto para negar la restitución del niño sustraído o retenido ilícitamente. En primer lugar, porque en la resolución sobre la procedencia de la restitución no cabe hacer análisis alguno sobre el derecho de custodia. En segundo lugar, el derecho fundamental previsto en dicho mandato constitucional es el de lograr el desarrollo integral del menor, sin que ahí se prevea como regla forzosa o exclusiva, que un menor de corta edad sólo podría alcanzarlo al lado de su madre, por lo que también es factible lograrlo junto a su padre, o algún otro familiar, según lo permita la ley.

CUARTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 766/2008. 19 de marzo de 2009. Unanimidad de votos. Ponente: Leonel Castillo González. Secretaria: Mónica Cacho Maldonado.

Registro No. 165491, Localización: Novena Época, Instancia: Tribunales Colegiados de Circuito, Fuente: Semanario Judicial de la Federación y su Gaceta, XXXI, Enero de 2010, Página: 2174, Tesis: I.4o.C.241 C, Tesis Aislada, Materia(s): Civil

5. – De igual manera, la controversia en el caso en concreto no radica en el buen o mal papel que como padre realiza el señor Trevor Andrew Richardson, como se pretendería acreditar con ciertos estudios psicológicos, ya que en todo caso dichos elementos son esenciales de la custodia y la propia Convención en su Artículo 16 señala que: "...las autoridades judiciales o administrativas del Estado Contratante donde haya sido trasladado el menor o donde esté retenido ilícitamente, no decidirán sobre la cuestión de fondo de los derechos de custodia hasta que se haya determinado que no se reúnen las condiciones de la presente Convención para la restitución del menor o hasta que haya transcurrido un periodo de tiempo razonable sin que se haya presentado una solicitud en virtud de esta Convención."

Case 2:26-cv-00595-SCD    Filed 04/08/26    Page 67 of 68    Document 1-1

  - 7 -

Subsecretaría para América del Norte
Dirección General de Protección a Mexicanos en el Exterior
Dirección de Derecho de Familia
Número: PME-115737.12
Referencia: Exp: PME/750-16(EUA-WI/MEX-QRO/07)154
Asunto: Restitución Internacional del Menor:
Andrew Richardson Farah

Aunado a esto, dichos estudios refieren basarse en el grado de adaptación del menor a su entorno, situación que como se ha señalado resulta improcedente en tanto que no se está en presencia de un caso en el que hubiere transcurrido un plazo mayor a un año de conformidad con el párrafo segundo del artículo 12 de la Convención.

6. - En este sentido, es de destacar que el presente procedimiento no es de restricción de derechos parentales sino por el contrario, es de definir la contravención a dichos derechos en virtud de una sustracción o retención ilícita; por lo que es ocioso y contradictorio a la norma entrar al estudio de quien es mejor padre o madre, pues la *litis* versa sobre el retorno del menor a su lugar de residencia habitual, para que ambos padres ante la corte competente hagan valer dichos derechos en acción diversa. Precisamente, el Artículo 19 de la Convención señala que: "Una decisión adoptada en virtud de la presente Convención sobre la restitución del menor no afectará la cuestión de fondo del derecho de custodia."

Lo anterior se transmite a ese H. Tribunal toda vez que a esta Unidad Administrativa en su calidad de Autoridad Central corresponde garantizar el cumplimiento con los objetivos de la Convención de conformidad con los artículos 2, 6 y 7 de la misma.

Reconociendo la atención que se sirva brindar al presente, aprovecho la oportunidad para enviarle un cordial saludo.

Atentamente
Director General

Roberto Rodríguez Hernández

C.c.p.- Carlos Manuel Septién Olivares Presidente del Tribunal Superior de Justicia del Estado de Querétaro. – Para su conocimiento y colaboración.
Mtro. Everardo Pérez Pedraza. – Juez Cuarto de lo Familiar del Centro de Justicia de Querétaro en el Estado de Querétaro. – Para su conocimiento.
Delegación de la S.R.E. en el Estado de Querétaro.- Para su conocimiento.

C Z CSM VZCI ICF.

Avenida Juárez Núm. 20, piso 17 Col. Centro, Del. Cuauhtémoc, C.P. 06010, México, D.F.,
Tel.: +52 (55) 3686 – 5100 Ext. 7648 y 7690 Fax: +52 (55) 3686-5865 http://www.sre.gob.mx